## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MBALAMINWE MWIMANZI,<br><br>        Plaintiff,<br> v.<br><br>JOSHUA WILSON, et al.,<br><br>        Defendants. | No. 20-cv-00079 (CRC) |

### PLAINTIFF'S STATEMENT OF FACTS

  Plaintiff Mbalaminwe Mwimanzi submits the following statements in support of his attached motion. First, in Part I, he responds to Defendants' Statement of Material Facts Not in Dispute. Second, in Part II, he provides additional facts in dispute as part of his opposition to Defendants' Motion for Summary Judgment. Finally, in Part III, Mr. Mwimanzi presents the set of facts that he contends are not in dispute in support of his own contingent motion for partial summary judgment.

**I. Response to Defendants' Statement of Material Facts Not in Dispute**

  Each of Defendants' allegedly undisputed facts is copied verbatim in the order presented by Defendants and is followed by Mr. Mwimanzi's response.

  1. On January 15, 2019, Officer C. Hyder with the Metropolitan Police Department filed an affidavit in support of an application for a search warrant (the Affidavit) with the Superior Court of the District of Columbia. See Affidavit in Support of Warrant and Search Warrant, attached as Ex. A.

 **Response**: Undisputed.

  2. The Affidavit shows months leading up to his application for the search warrant, Officer Hyder had investigated a series of drug complaints from citizens about 769 Quebec Place, NW, Apartment 2 (the Apartment). *Id.*

 **Response**: Undisputed.

1

3. Officer Hyder received information from a Confidential Informant about "multiple drug users and drug dealers [ ] entering [the Apartment]…." *Id.*

**Response**: Undisputed.

4. Margie Whitehead was identified as the lease holder who "allowed other individuals to use her apartment." *Id.*

**Response**: Undisputed.

5. The Confidential Informant reported "that on a daily basis there ha[d] been heavy foot traffic going to and from [the] Apartment…, the front lobby of the apartment building, and the rear alley of the building." *Id.*

**Response**: Undisputed.

6. Officer Hyder also observed "heavy foot traffic entering and existing the building." *Id.*

**Response**: Plaintiff does not dispute that Officer Hyder reported in his affidavit that he made such observations.

7. Based on the affidavit, a Superior Court of the District of Columbia Judge found probable cause to grant the search warrant (Search Warrant) to search the Apartment for drugs and/or narcotics, drug paraphernalia, scales, packaging and processing materials, safes, containers both locked and unlocked, cash, computers, records, tally sheets, books, receipts, notes, ledgers, bank records, telephone bills, money orders, and other papers documenting the importation, purchase, processing and manufacturing, ordering, sale, and distribution of any illicit drugs, as well as proof of residency. *See* Ex. A.

**Response**: Undisputed.

8. On January 15, 2019, before the execution of the Search Warrant, Officer Joshua Wilson received a copy of it but not the Affidavit. He attended a briefing to discuss the search warrant and the background; briefings occur before every search warrant is executed. Officer Joshua Wilson Dep. at 17:8-19, Ex. C.

**Response**: Undisputed.

9. At the briefing, Officer Wilson learned about the contents of the Affidavit; he learned "multiple individuals were going in and out of the apartment, going in and out of the apartment buying and selling drugs -- believed to be buying and selling drugs." Ex. C at 18:2-4.

**Response**: Undisputed.

10.     The Search Warrant was executed by MPD police on January 15, 2019. Plaintiff's Answers to Defendants' Interrogatories at No. 4, attached as Ex. B.

**Response**: Undisputed.

11.     Officer Joshua Wilson entered the Apartment after the other officers and he searched Mwimanzi for drugs and drug paraphernalia as identified on the Search Warrant. Ex. C at 39:4-11.

**Response**: Plaintiff does not dispute that the items Defendant Wilson sought to locate through his search were drugs and drug paraphernalia.

12.     Officer Wilson's search of Mwimanzi was captured on Officer Wilson's Body Worn Camera (BWC). Ex. D from 02:19:32Z to 02:19:39Z.

**Response**: Plaintiff disputes that the search lasts from 2:19:32Z to 2:19:39Z as it actually lasted until 2:20:39Z. *See* Defs.' Ex. D. Otherwise, Plaintiff does not contest this assertion on the understanding that, in stating that the BWC "captured" the search, paragraph 12 does not make averments about the comprehensiveness of the recording in terms of its ability to provide a clear, visual depiction of the crucial aspects of the encounter.

13.     At deposition, Mwimanzi testified that he told Officer Wilson, "Stop, you know, molesting me. Stop fingering me dude." May 21, 2021 Deposition of Mbalaminwe Mwimanzi, attached as Ex. E at 77:15-19

**Response**: Undisputed.

14.     Mwimanzi testified that he flinched as soon as he spread his legs when Officer Wilson instructed him to do so. Ex. E at 110:5-7; 111:15-19.

**Response**: Undisputed.

15.     Mwimanzi testified he gasped because Officer Wilson struck him on his testicles. Ex. E at 79:3-4.

**Response**: Undisputed.

16.     Officer Wilson testified that if he knew Mwimanzi had been searched, he would not have searched him. Ex. C at 69:25-70:4.

**Response**: Undisputed.

17.     Officer Wilson believed that a pat down and frisk occurred, but not that a search had been conducted of Mwimanzi for contraband as Officer Seijo's role was not to conduct searches. Ex. C at 64:5-15.

**Response**: Plaintiff disputes that Defendant Wilson believed the facts asserted in this paragraph. Prior to searching Mr. Mwimanzi, Defendant Wilson asked if Mr. Mwimanzi had been searched and another officer stated "a Seijo search." Defs.' Ex. D (Def. Wilson's Body-Worn Camera Footage from Jan. 15, 2019) 2:19:40–44 (hereinafter Defs.' Ex. D ("Wilson BWC Video")). That statement, combined with Defendant Wilson's knowledge of Officer Seijo's effectiveness in conducting searches, *see* Part II, *infra* ¶¶ 16, 17, and Wilson's contradictory statements at deposition on the basis for his purported assumption that a frisk, rather than a search occurred, *id.* ¶¶ 14, 15, undercuts Defendant Wilson's testimony about the type of search he believed Officer Seijo conducted.

18.     Officer Wilson began his search of Mwimanzi in his groin area because "in [his] experience, that's where a lot of drug dealers and users hide things." Ex. C at 46:14-21.

**Response**: Plaintiff disputes that Defendant Wilson chose to begin his search with Mr. Mwimanzi's groin solely because he believed he would find drugs there. Instead, Mr. Mwimanzi contends that Defendant Wilson targeted his groin out of a desire to humiliate or otherwise harm him. To support this assertion, Mr. Mwimanzi points to Defendant Wilson's decision to conduct the search despite knowing that Mr. Mwimanzi had been searched previously, *see* Part II, *infra*, ¶¶ 13–18; Defendant Wilson's request that Mr. Mwimanzi spread his legs wider than he had for other officers, *id.* ¶ 19; Defendant Wilson's targeting of Mr. Mwimanzi's testicles and buttocks to the exclusion of other body parts, *id.* ¶¶ 20, 21; the aggressive, humiliating way he searched Mr. Mwimanzi's testicles and buttocks, and his refusal to stop or change how he conducted the search in response to Mr. Mwimanzi's protests *id.* ¶¶ 22–31;

4

the prolonged pain and emotion distress caused by Defendant Wilson's search, particularly given that Mr. Mwimanzi did not complain that other searches he experienced on January 15, 2019 caused him similar hardship, *id.* ¶¶ 5, 10, 36–43, 46; and the look of satisfaction Defendant Wilson displayed at the end of the search as well as his taunting expression when he subsequently encountered Mr. Mwimanzi, *id.* ¶¶ 32, 47–48.

19. Officer Wilson believed the search was appropriate because what was contained in the search warrant could be on Mwimanzi's body. Ex. C at 21:4-22.

**Response**: Plaintiff disputes that Defendant Wilson believed his search of Mr. Mwimanzi was appropriate for the reasons discussed in response to ¶ 18.

20. And Officer Wilson believed his conduct was lawful based on MPD General Order 702.03. Ex. C at 21:4-22:8.

**Response**: Plaintiff does not dispute that Defendant testified that he believed that MPD General Order 702.03 authorized him to initiate his search of Mr. Mwimanzi but disputes that Defendant Wilson believed that the manner in which he searched Mr. Mwimanzi was lawful for the reasons discussed in response to ¶ 18.

21. Mwimanzi did not retain a police practices expert. Plaintiff's Responses to Defendants' Requests for Production of Documents at Nos. 6, 10, 12, 14 attached as Ex. F.

**Response**: Plaintiff does not dispute this fact but notes that the exhibit attached as Def. Ex. F is the response that Defendant District of Columbia submitted to Plaintiff's request for production, not the response that Plaintiff submitted to Defendant.

## II.   Statement of Disputed Material Facts

1. Mbalaminwe Mwimanzi immigrated with his family to the United States from Tanzania at eight years old, grew up in the Washington, D.C. area, and has continued to live in the region since, graduating from high school, attending some college, and working in several

different fields. Pl.'s Ex. A (Deposition of Mbalaminwe Mwimanzi) 22:11–22, 24:22–26:8; (May 21, 2021) (hereinafter "Pl.'s Ex. A (Mwimanzi Dep.)").[1]

2. On January 15, 2019, Mr. Mwimanzi visited his friend Margie Whitehead at her apartment, located at 769 Quebec Places Northwest, Apartment 2, to watch television with friends. Pl.'s Ex. A (Mwimanzi Dep.) 37:6–8, 39:20–40:9; *see also* Pl.'s Ex. B (Pl's Resp. to Defs.' First Set of Interrogs.) ¶ 4 (hereinafter "Pl.'s Ex. B (Pl.'s Resp. to Interrogs.").[2]

3. At approximately 9 p.m., officers with the District's Metropolitan Police Department (MPD) broke down Ms. Whitehead's door and stormed into the apartment, ordering everyone present to lie on the ground and submit to handcuffing, commands that Mr. Mwimanzi obeyed. Pl.'s Ex. A (Mwimanzi Dep.) 61:10–62:9; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

4. After Mr. Mwimanzi was handcuffed, an officer helped him to his feet, patted him down, and pulled out his wallet from his coat pocket to check his ID. Pl.'s Ex. A (Mwimanzi Dep.) 57:9–14; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

5. Mr. Mwimanzi did not protest the way this officer inspected him. Pl.'s Ex. A (Mwimanzi Dep.) 119:21–120:1; *see also* Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

6. The officer did not find any evidence, weapons, drugs, or other contraband on Mr. Mwimanzi's person. Compl., ECF No. 1 ¶ 15; Answer, ECF No. 4 ¶ 15 (admitting corresponding paragraph from complaint).

---

[1] Mr. Mwimanzi has redacted portions of the deposition transcript that contain sensitive, personal information not central to the pending motions. Upon the Court's request, Mr. Mwimanzi will file an unredacted version of the transcript under seal.

[2] Mr. Mwimanzi has redacted portions of his response to Defendants' interrogatories that contain sensitive, personal information not central to the pending motions. Upon the Court's request, Mr. Mwimanzi will file an unredacted version of the responses under seal.

7. Officer Terrence Sutton Jr. called Mr. Mwimanzi toward him. Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

8. Officer Sutton told Mr. Mwimanzi "you don't run shit" and referred him to Officer Jose Seijo for another search, *id.*

9. Officer Seijo searched Mr. Mwimanzi "more intrusively" than the mere frisk he experienced previously. *Id.*

10. Mr. Mwimanzi again did not criticize the manner in which Officer Seijo searched him. Pl.'s Ex. A (Mwimanzi Dep.) 120:2–4; *see also* Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

11. Officer Seijo did not find any evidence, weapons, drugs, or other contraband on Mr. Mwimanzi's person. Compl., ECF No. 1 ¶ 19; Answer, ECF No. 4 ¶ 19 (admitting corresponding paragraph from complaint).

12. When Officer Seijo finished the search, Mr. Mwimanzi sat in a chair, still in handcuffs. Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

13. Defendant Joshua Wilson approached Mr. Mwimanzi and ordered him to stand, and asked the other officers, "has he been searched," to which an officer responded "a Seijo search." Deposition of Joshua Wilson 63:6–18 (May 4, 2021) (hereinafter "Pl.'s Ex. C (Wilson Dep.)"); Defs.' Ex. D (Wilson BWC Video) 2:19:40–44.

14. Defendant Wilson testified that he understood the phrase "Seijo search" to mean that Mr. Mwimanzi "hadn't been fully searched" but when asked whether there was anything that led him to that conclusion, Defendant Wilson answered "no." Pl.'s Ex. C (Wilson Dep.) 69:11–23.

15. Despite that statement, Defendant Wilson also testified that he did have a basis for his interpretation of the phrase "Seijo search"—specifically, that Officer Seijo was not assigned

to conduct searches that day. Pl.'s Ex. C (Wilson Dep.) 64:5–15. However, Defendant Wilson did not testify that officers effecting a search warrant refrain from taking on additional duties besides those assigned to them. *Id.*

16. Defendant Wilson has worked with Officer Seijo and seen him conduct searches. Pl.'s Ex. C (Wilson Dep.) 42:13–18.

17. At deposition, Defendant Wilson could not recall ever seeing Officer Seijo conduct a search he deemed inadequate or wrong in any way and described Officer Seijo as "effective" at conducting searches. Pl.'s Ex. C (Wilson Dep.) 42:13–43:17.

18. Nonetheless, Defendant Wilson told Mr. Mwimanzi to spread his legs. Pl.'s Ex. A (Mwimanzi Dep.) 65:22–66:2; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

19. Mr. Mwimanzi spread his legs around the same distance as he had for the prior searches; Defendant Wilson told him to spread them wider. *Id.*; *see also* Pl.'s Ex. A (Mwimanzi Dep.) 65:22–66:2.

20. Defendant Wilson did not search Mr. Mwimanzi's chest, his waistband, his socks, his hat, or pull out his pants pockets. Pl.'s Ex. C (Wilson Dep.) 46:14–1, 47:5–10.

21. The focus of his search consisted of two places: Mr. Mwimanzi's groin and his buttocks. *Id.* (stating that search was limited to groin); Pl.'s Ex. A (Mwimanzi Dep.) 80:13–81:5 (stating that he did not recall Defendant Wilson searching anywhere but his groin and his buttocks).

22. Defendant Wilson reached inside Mr. Mwimanzi's buttocks through his jeans and, as Mr. Mwimanzi testified, "pressed my anus with his finger as if he was trying to penetrate me." Pl.'s Ex. A (Mwimanzi Dep.) 67:5–8; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

23. Defendant Wilson placed his hands between Mr. Mwimanzi's legs rubbing each of Mr. Mwimanzi's testicles against Mr. Mwimanzi's leg. Pl.'s Ex. A (Mwimanzi Dep.) 70:22 – 71:9; Pl.'s Ex. B (Pl.'s Resp. to Defs.' Interrogs.) ¶ 4. Defendant Wilson also "us[ed] the power of his hands to squeeze" each of Mr. Mwimanzi's testicles against his leg. *Id.* 71:10–71:21; Pl.'s Ex. B (Pl.'s Resp. to Defs.' Interrogs.) ¶ 4.

24. Defendant Wilson did not feel anything in Mr. Mwimanzi's groin area. Pl.'s Ex. C (Wilson Dep.) 48:3–5.

25. And he did not find any evidence, drugs, weapon or other contraband. Compl., ECF No. 1 ¶ 33; Answer, ECF No. 4 ¶ 33 (admitting corresponding paragraph in the complaint).

26. Yet Defendant Wilson still squeezed and rubbed Mr. Mwimanzi's testicles at least twice. Pl.'s Ex. A (Mwimanzi Dep.) 83:16–17; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

27. Mr. Mwimanzi flinched when Defendant Wilson began the search, *id.* 111:18–19, asked him to stop multiple times, *id.* 79: 3–7, and gasped when he continued searching, *id. See also* Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 4.

28. Specifically, when Defendant Wilson began the search, Mr. Mwimanzi said "You're gonna fondle me, buddy? . . . You're fondling me, buddy. You're fondling me, buddy. . . . You just fondled me buddy." Defs.' Ex. D. at 2:20:06Z–2:20:14Z

29. Then, as the search continued, Mr. Mwimanzi gasped and protested "Again? Again, though? Again! Oh my God, Again! Damn, you gonna finger fuck me? Damn, bruh." *Id.* at 2:20:23Z–2:20:31Z

30. Mr. Mwimanzi thought these statements would make clear to Defendant Wilson that he wanted him to stop:

> You are an officer and the words[,] "You are finger-fucking me. You are fondling me." That's to stop. You're not searching me. You're fondling me. . . . That means stop.

Pl.'s Ex. A (Mwimanzi Dep.) 109:16–21.

31. But when Mr. Mwimanzi began to complain, Defendant Wilson did not stop. Defs.' Ex. D (Wilson BWC Video) 2:20:12–24; nor did he alter the way he was conducting the search, Pl.'s Ex. C (Wilson Dep.) 48:11–15.

32. Once he finished with Mr. Mwimanzi's groin and buttocks, Defendant Wilson looked at Mr. Mwimanzi, who had been handcuffed throughout the entirety of the search, with a look of satisfaction. Pl.'s Ex. B (Pl.'s Resp. to Def.'s Interrogs.) ¶ 4.

33. Defendant Wilson then ordered Mr. Mwimanzi to sit. Pl.'s Ex. C (Wilson Dep.) 47:24–48:2.

34. At deposition, Defendant Wilson did not assert that he had authority to conduct the type of search Mr. Mwimanzi described but rather denied several of Mr. Mwimanzi's allegations as to the manner of the search. Specifically, he stated that he did not search Mr. Mwimanzi's buttocks, *id.* 49:17–22, noting that he would not reach inside a person's buttocks during a search and that if he believed an individual had evidence in their buttocks, he would inspect that area at the station, *id.* 30:14–31:10.

35. Defendant Wilson likewise said that he did not "think" he touched Mr. Mwimanzi's testicles through his clothing. *Id.* 48:16–18.

36. During the search, Mr. Mwimanzi felt pain around his anus, throbbing pain in his testicles that radiated to his abdomen, and had a headache. Pl.'s Ex. A (Mwimanzi Dep.) 76:17–77:3; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 11.

37. After the search, he complained of intense pain and rode in an ambulance to MedStar Washington Hospital Center, where he received treatment. Pl.'s Ex. A (Mwimanzi Dep.) 84:7–10, 85:4–10.

38. The pain in Mr. Mwimanzi's buttocks lasted for three days after the search, making it uncomfortable for him to perform essential activities such as walking or using the bathroom. Pl.'s Ex. A (Mwimanzi Dep.) 69:3–7, 84:15–86:3; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 11.

39. The throbbing pain in his testicles lasted a month after the search, making it difficult for him to wear a harness, safety apparel that his employer required him to wear while performing some of his duties. Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 11; Pl.'s Ex. A (Mwimanzi Dep.) 104:10–11. Pain when running or biking has lasted even longer. Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 11; Pl.'s Ex. A (Mwimanzi Dep.) 69:3–9.

40. Mr. Mwimanzi considered seeking additional medical treatment but ultimately, he feared that a doctor would tell him that he could not bear children, and the anxiety about receiving that news made him avoid additional medical care. Pl.'s Ex. A (Mwimanzi Dep.) 100:1–5.

41. Emotionally, "Mr. Mwimanzi feels depressed to the point of experiencing physical pain in his testicles and abdomen when he discusses or thinks about the incident—and "he generally thinks about the incident when he sees police officers or hears sirens." Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 15; *see also* Pl.'s Ex. A (Mwimanzi Dep.) 89:15–17; 104:9–18.

42. Mr. Mwimanzi also feels anxiety when he encounters law enforcement. *Id.* 93:17–19, 98:17–99:1; Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 15.

43. Professionally, Mr. Mwimanzi took the day following the search off from work because he was in pain from Defendant Wilson's actions, and thereafter became districted at

11

work when he heard police sirens. Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 15; *see also* Pl.'s Ex. A (Mwimanzi Dep.) 104:4–11; 113:19.

44.     Socially, the search, which occurred in front of Mr. Mwimanzi's friends, humiliated him. *Id.* 77:6–10.

45.     One friend who was present for the event mocked that Mr. Mwimanzi "acted like a little bitch," *id.* 92:9, and said that Mr. Mwimanzi enjoyed Defendant Wilson's search of him, *id.* 98:1–3. These comments have strained the relationship. *Id.* 97:15–18.

46.     Additionally, the trauma of the incident has caused Mr. Mwimanzi to visit Ms. Whitehead's home less frequently, weaking his friendship with her. Pl.'s Ex. B (Pl.'s Resp. to Interrogs.) ¶ 20.

47.     Several months after the search, Officer Wilson spotted Mr. Mwimanzi on Quebec Place, the same street where the search had occurred. Pl.'s Ex. A (Mwimanzi Dep.) 63:8–64:5.

48.     Defendant Wilson stuck his tongue out at Mr. Mwimanzi as the officers drove past and Mr. Mwimanzi called out "fucking sex offender." *Id.* 63:8–11, 64:2–7.

49.     Mr. Mwimanzi considered Defendant Wilson's actions toward him not a police search but a sexual assault, and he has been living with the trauma of that experience ever since. *Id.* 66:9–13.

### III.    Plaintiff's Statement of Undisputed Material Facts in Support of His Contingent Motion for Summary Judgment

1.      Defendant Wilson was standing "right next to" the door when Sgt. Bryan Cox knocked and announced that the police had arrived. Pl.'s Ex. C (Wilson Dep.) 24:6–15.

2.      Defendant Wilson did not recall hearing any sounds coming from the other side of the door in the approximately five to ten seconds that elapsed between the time Sgt. Cox

knocked and the time Defendant Wilson broke down the door with a ram. Pl.'s Ex. C (Wilson Dep.) 23:16–18; 24:19–25:8.

3. At deposition, Defendant Wilson described his treatment of Mr. Mwimanzi as a search, not a pat down, and explained that he conducted it to find drugs and drug paraphernalia. Pl.'s Ex. C (Wilson Dep.) 38:22–39:11.

4. Prior to conducting the search, Defendant Wilson had not seen anyone selling drugs in the apartment, had not seen any drugs in the apartment, and had not seen any drug paraphernalia in the apartment. Pl.'s Ex. C (Wilson Dep.) 39:12–40:3.

5. Indeed, MPD reported that "nothing [was] seized" from Ms. Whitehead's residence. Pl.'s Ex. D (Warrant & Affidavit) at 1 (return filed with the D.C. Superior Court on January 16, 2019).

6. Defendant Wilson did not seek Mr. Mwimanzi's consent for the search. Compl., ECF No. 1 ¶ 50; Answer, ECF No. 4 ¶ 50 (admitting corresponding paragraph in complaint).

7. Nor was Mr. Mwimanzi placed under arrest at the time of Defendant Wilson's search, or at any other point that evening. *See* Compl., ECF No. 1 ¶ 52; Answer, ECF No. 4 ¶ 52 (admitting corresponding paragraph in complaint).

8. Instead, the sole basis for Defendant Wilson's search of Mr. Mwimanzi was the January 15, 2019 warrant that Officer C. Hyder secured to search Mr. Whitehead's home. Pl.'s Ex. C (Wilson Dep.) 40:4–7 (Q. "So other than the information you had in the warrant, were there any other facts that led you to search Mr. Mwimanzi?" A. "No. Just the warrant.").

9. The D.C. Superior Court judge who issued that warrant found "probable cause to believe that in the **Residence** known as **769 Quebec Place #2 Northwest Washington, D.C.**

**20010** . . . there is now being concealed property, namely" drugs, drug paraphernalia, and related items. Pl.'s Ex. D (Warrant & Affidavit) at 1 (emphasis original).

10. The warrant authorized MPD "within 10 days of the date of issuance of this warrant to search at any time of the **(day or night)** the designated **Residence** for the property specified." *Id.* (emphasis original).

11. The warrant did not contain any statements authorizing officers to search people found in the residence; nor did the judge state that probable cause existed to believe any people in the residence, known or unknown, would have those items on their person at any specific time, let alone within the ten-day period the officers had to execute the warrant. *See id.*

12. Officer Hyder did not request such a finding or state in his affidavit that probable cause supported such a finding. *See id.* ("Affiant submits that there is probable cause to believe that inside of the Residence known as **769 Quebec Place #2 Northwest Washington, D.C. 20010** . . . there is now being concealed property." (quoting affidavit; emphasis original)).

13. Other than Margie Whitehead, who was identified as the leaseholder, the affidavit did not mention any individuals by name, nor did it provide a physical description of any other individuals. *Id.* at 2–5.

14. Prior to entering Ms. Whitehead's apartment, Defendant Wilson received a copy of the warrant, attended a briefing on the affidavit, and knew that the warrant said nothing about searching individuals and that it did not identify Mr. Mwimanzi. Pl.'s Ex. C (Wilson Dep.) 17:8–19; 18:5–9, 18.

15. He therefore knew or should have known that Ms. Whitehead was the leaseholder, and Mr. Mwimanzi was not. *See id.*; Pl.'s Ex. D (Warrant & Affidavit) at 2-5.

16.     He nonetheless believed that MPD General Order 702.03 and D.C. Code § 23-524 authorized to search everyone inside Ms. Whitehead's apartment. Pl.'s Ex. E (Wilson Answer to Pl.'s First Set of Interrog.) ¶ 4.

17.     At deposition, Defendant Wilson testified that it was his understanding that under D.C. policy, when officers have a warrant to search a private residence, "everybody [inside the residence] can be searched as long as . . . what's contained in the search warrant can be contained on their body in the scope of the search warrant." Pl.'s Ex. C (Wilson Dep.) 21:15–18. Because "drugs and drug paraphernalia can be contained on someone's body," a warrant for those items means that "everybody is subject to the search that's inside the residence at that time." *Id.* 21:18–23.

Date: September 10, 2021                          Respectfully submitted,
                                                  */s/ Michael Perloff*
                                                  Michael Perloff (D.C. Bar No. 1601047)
                                                  Arthur B. Spitzer (D.C. Bar No. 235960)
                                                  Scott Michelman (D.C. Bar No. 1006945)
                                                  American Civil Liberties Union Foundation
                                                      of the District of Columbia
                                                  915 15th Street NW, Second Floor
                                                  Washington, D.C. 20005
                                                  (202) 457-0800
                                                  mperloff@acludc.org

                                                  *Counsel for Plaintiff*