### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**MBALAMINWE MWIMANZI,**

Plaintiff,

v.

**JOSHUA WILSON,** *et al.*,

Defendants.

Case No. 20-cv-79 (CRC)

### MEMORANDUM OPINION

On January 15, 2019, while executing a search warrant for a private residence,

Metropolitan Police Department ("MPD") Officer Joshua Wilson conducted a personal search of

a visitor to that apartment—plaintiff Mbalaminwe Mwimanzi.  Mwimanzi brought suit against

the District of Columbia and Wilson to challenge the legality of various aspects of his search.

Now before the Court are dispositive motions concerning three claims:  a claim under 42 U.S.C.

§ 1983 against the District challenging, under the Fourth Amendment, the D.C. statute and MPD

policy that authorized the search; a § 1983 claim against Officer Wilson, based on allegations

that the search he conducted was unduly aggressive and sexually invasive, also in violation of

Mwimanzi's Fourth Amendment rights; and a common law battery claim against both Wilson

and the District, based on the same allegations concerning the manner of the search.

The Court sides mostly with Mwimanzi.  The Court will first grant his request to add a

§ 1983 claim against the District related to Officer Wilson's decision to conduct the search,

which was not included in the original complaint.  Mwimanzi is also entitled to partial summary

judgment on this new claim because the relevant portions of D.C. Code § 23-524(g) and MPD

General Order 702.03 § VII(F)(8)(f) are unconstitutional at least in circumstances that resemble

Mwimanzi's.  Those provisions authorize officers executing a premises search warrant to search

any person found inside for property named in the warrant that could be hidden on the body. Such a broad license to search beyond the face of the warrant—at least when no other circumstances tie the person searched to wrongdoing at a residence—runs afoul of the Fourth Amendment, under the guidance set out in Ybarra v. Illinois, 444 U.S. 85 (1979) and related case law.

As to Mwimanzi's manner-of-search claims, the Court will grant in part and deny in part the defendants' motion for summary judgment. As explained in more detail below, Mwimanzi's Fourth Amendment and common law battery claims can survive summary judgment to the extent they focus on the allegedly over-aggressive and invasive nature of the search. Officer Wilson is not entitled to qualified immunity on any constitutional claim relating to such allegations, and neither defendant is entitled to a qualified privilege with respect to the related battery claim. However, the Court will grant the defendants summary judgment on these claims insofar as Mwimanzi seeks to challenge the mere fact that Wilson conducted a full search—including of Mwimanzi's groin area. Although the scope of the search was indeed unlawful, that limitation was not clearly established at the time of the search. For those reasons, the Court will grant Mwimanzi's motion to amend his complaint, grant his motion for summary judgment, and grant in part and deny in part the defendants' motion for summary judgment.

## I.    Background

### A.  Statutory Background

In his § 1983 claim challenging Officer Wilson's authority to search him, Mwimanzi asks the Court to hold that a provision of D.C. law and an MPD policy implementing that statute are either facially unconstitutional, or violate the Fourth Amendment as applied here. The Court begins with a brief overview of the two provisions.

D.C. Code § 23-524(g) provides that

[a]n officer executing a warrant directing a search of premises or a vehicle may search any person therein (1) to the extent reasonably necessary to protect himself or others from the use of any weapon which may be concealed upon the person, or (2) to the extent reasonably necessary to find property enumerated in the warrant which may be concealed upon the person.

Only the second authorized rationale—to find concealable property—is at issue here.  The MPD standing order on search warrants implements this statute.  In relevant part, it provides that an officer executing a search warrant "may search any person on the premises to the extent reasonably necessary to ensure safety and/or find contraband or property enumerated in the search warrant."  MPD General Order 702.03 § VII(F)(8)(f).

B.  Factual Background

On January 15, 2019, an officer with the MPD applied for a warrant to search the residence at 769 Quebec Place, NW, Apartment 2.[1]  Defs.' SMF ¶¶ 1–2; Pl.'s SMF I, ¶¶ 1–2.  According to the affidavit supporting the warrant application, over the previous months, several neighbors and attendees at community meetings had complained about drug activity in the

---

[1] The Court draws this factual statement from parties' competing statements of material fact.  See Defs.' Statement of Material Fact Not in Dispute ("Defs.' SMF"), ECF No. 27-1; Pl.'s Statement of Facts ("Pl.'s SMF"), ECF No. 30-1; Defs.' Resps. to Pl.'s Statement of Facts ("Defs.' Resps. to Pl.'s SMF"), ECF No. 34-1.  The plaintiff has split his statement into three sections, and those sections are not continuously numbered.  The Court refers to them by the relevant subsections, then paragraph number:  i.e., his responses to the defendants' statement as Pl.'s SMF I, his statement of disputed material facts as Pl.'s SMF II, and his statement of undisputed material facts as Pl.'s SMF III.  The Court uses a similar system to refer to the four separately numbered sections the defendants filed in response to the plaintiff's statement.  Based on the pending motions, the Court must construe the facts as they relate to the plaintiff's initiation of search claim—on which he has moved for partial summary judgment—in favor of the defendant, the District of Columbia.  By contrast, the Court construes the facts as they relate to the plaintiff's manner of search claims—on which the defendants have moved for summary judgment—in favor of Mwimanzi.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); cf. Sherwood v. Washington Post, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (explaining that, on cross-motions for summary judgment, "each side concedes that no material facts are at issue only for the purposes of its own motion").

apartment.  Specifically, they alleged that the apartment's resident, Margie Whitehead,

"allow[ed] multiple individuals into her apartment in order to deal drugs."  Pl.'s Ex. D at 3

("Warrant & Aff."), ECF No. 30-6.  A confidential informant corroborated the complaints.

Defs.' SMF ¶¶ 3–5.

 Based on that application and affidavit, a Superior Court judge found probable cause to

believe that drugs and narcotics, drug paraphernalia, cash, and other instruments of the drug

trade were concealed in the Quebec Place apartment.  Warrant & Aff. at 1.  The judge therefore

issued a warrant to search for the named items at the "Residence known as 769 Quebec Place

#2."  Id.  Later that day, a team of MPD officers, including defendant Joshua Wilson, received a

copy of the search warrant and, at a briefing, learned the details of the MPD investigation set out

in the warrant affidavit.  Defs.' SMF ¶¶ 8–9; Pl.'s SMF I, ¶¶ 8–9.

 MPD executed the search warrant on the night of January 15.  Defs.' SMF ¶ 10; Pl.'s

SMF II, ¶ 3.  Around 9 p.m., officers knocked on the apartment door.  Pl.'s SMF II, ¶ 3; Defs.'

Resps. to Pl.'s SMF II, ¶ 3.  After waiting five to ten seconds with no answer, officers broke

down the door, entered, and ordered everyone inside to lie on the ground and submit to

handcuffing.  Pl.'s SMF II, ¶ 3; Defs.' Resps. to Pl.'s SMF III, ¶ 2; Defs.' Resps. to Pl.'s SMF

IV, ¶ 9.  Mwimanzi was one of at least four individuals inside the apartment that night.  Pl.'s

SMF II, ¶ 2; Defs.' Resps. to Pl.'s SMF II, ¶¶ 2–3; Defs.' Ex. D ("Body-Worn Camera Footage")

at 2:19:13–2:19:20.  Over the course of the next several minutes, MPD officers subjected

Mwimanzi to three different searches of varying scopes.

 After Mwimanzi was handcuffed, an MPD officer first patted him down and pulled out a

wallet from his coat pocket to check for identification.  Pl.'s SMF II, ¶ 4; Defs.' Resps. to Pl.'s

SMF II, ¶ 4.  That initial pat down did not turn up any drugs, weapons, or other contraband.  Pl.'s

4

SMF II, ¶ 6; Defs.' Resps. to Pl.'s SMF II, ¶ 6.  Mwimanzi was soon searched again, apparently by MPD Officer Jose Seijo.[2]  Pl.'s SMF II, ¶¶ 8–9.  According to Mwimanzi, this second encounter constituted a full search—"more intrusive[]" than the mere frisk the first officer had performed.  Id. ¶ 9.  The defendants dispute this characterization; in their view, the record does not support a finding that this second interaction was more than just a pat down.  See Defs.' Resps. to Pl.'s SMF II, ¶ 9.  Whatever its scope, this encounter did not turn up drugs or other contraband either.[3]  Pl.'s SMF II, ¶ 11; Defs.' Resps. to Pl.'s SMF II, ¶ 11.

After Mwimanzi sat back down, Officer Wilson approached him and ordered him to stand.  Pl.'s SMF II, ¶ 13.  Wilson called out to other officers on the scene to ask whether Mwimanzi had been searched yet—to which one responded, apparently, "a Seijo search."[4]  Id. Wilson then began to conduct a full search of Mwimanzi.  Defs.' SMF ¶ 11; Pl.'s SMF II, ¶¶ 18–23.  At his deposition, Wilson testified that, when deciding to search Mwimanzi, he relied only on the information in the warrant and the authorization in MPD General Order 702.03.  See Pl.'s SMF III, ¶ 17; Defs.' Resps. to Pl.'s SMF III, ¶¶ 16–17.

---

[2] The defendants claim that there is insufficient evidence to find that Officer Seijo was involved in this second encounter.  See Defs.' Resps. to Pl.'s SMF II, ¶¶ 9–11.  This factual dispute is not material to the Court's evaluation of the claims.

[3] The defendants argue that the Court should not accept Mwimanzi's statement of facts on this point because it relies on the Complaint and corresponding admission in their Answer, neither of which are verified.  See Defs.' Resps. to Pl.'s SMF II, ¶ 11.  The Court disagrees.  An admission in an answer to a complaint is ordinarily considered binding and can be considered at summary judgment.  See United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 748 (D.C. Cir. 1998).

[4] At oral argument, the defendants argued that the other officer in fact told Wilson Mwimanzi had been subject to "a basic search," not a "Seijo search"—indicating to Wilson that no full search had yet been conducted.  See Mot. Hr'g Rough Tr. at 52:2–9.  Notably, the defendants did not object to the plaintiff's characterization of the statement as "a Seijo search" in their statement of material facts.  See Defs.' Resps. to Pl.'s SMF II, ¶ 13.  Again, any dispute about this exchange is largely immaterial to any of the Court's determinations.

Wilson's search, which took under a minute, focused largely on Mwimanzi's groin and buttocks. See Defs.' SMF ¶ 18; Pl.'s SMF II, ¶¶ 20–21; see also Body-Worn Camera Footage at 2:19:50–2:20:34. The parties dispute the reason Officer Wilson targeted Mwimanzi's groin area, as well as the nature and scope of the intrusion. Although Wilson's body-worn camera captured the encounter, including Mwimanzi's contemporaneous reactions, the camera angle largely does not show Wilson's hands or Mwimanzi's groin and buttocks—the key area of dispute.

In Mwimanzi's telling, Wilson directed his search at the "groin out of a desire to humiliate or otherwise harm him"—an allegation he says is supported by Wilson's "targeting" of the "testicles and buttocks to the exclusion of other body parts"; "the aggressive, humiliating way" he conducted the search, despite Mwimanzi's repeated protestations that Wilson was "fondling" him; and the fact that Mwimanzi had already been searched without turning up any contraband. See Pl.'s SMF I, ¶ 18; Pl.'s SMF II, ¶ 28. In his deposition, Mwimanzi also testified extensively about how Wilson conducted the search. He recounted that Wilson, through his pants, had "squeeze[d] [his] butt cheeks," and "rub[bed]" and "squeez[ed]" his testicles. Pl.'s Reply in Supp. of Mot. Amend, Opp'n to Def.'s Mot. Summ. J., and Contingent Mot. Partial Summ. J. ("Pl.'s Combined Br."), ECF No. 30, Ex. A ("Mwimanzi Dep.") at 66:5–18. Mwimanzi also described feeling "pressure on [his] anus because [Wilson] put his finger there." Id. at 66:7–8. On the video, Mwimanzi can be heard repeatedly telling Wilson, "You're fondling me," and at one point exclaiming that Wilson was "finger f—[ing]" him. See Body-Worn Camera Footage at 2:20:10–2:20:34. Mwimanzi goes so far as to characterize the encounter as a sexual assault. Mwimanzi Dep. at 66:14–15, 77:7–10. He further testified to experiencing significant pain in his testicles and anus during the search, lingering for several weeks afterward.

Pl.'s SMF II, ¶¶ 37–39.  Mwimanzi also reported embarrassment and social stigma from friends who witnessed the search.  Id. ¶¶ 44–45.

Wilson and the District dispute this account.  In their view, Wilson appropriately began his search with Mwimanzi's groin area because "in [his] experience, that's where a lot of drug dealers and users hide things."  Defs.' SMF ¶ 18.  Wilson also did not recall touching Mwimanzi's testicles through his clothing.  See Pl.'s SMF II, ¶ 35; Defs.' Resps. to Pl.'s SMF II, ¶¶ 23, 35.  The defendants otherwise put forward no alternate account of the search, although they claim that Mwimanzi's testimony is "self-serving" and at least in part "contradicted" by the body-worn camera footage.  See, e.g., Defs.' Resps. to Pl.'s SMF II, ¶¶ 26–29.  It is undisputed that this final search did not turn up any weapons, drugs, or other contraband.  Defs.' Resps. to Pl.'s SMF II, ¶ 25.

C.  Proceedings

On January 13, 2020, Mwimanzi filed suit against the District of Columbia and Officer Wilson.  See Compl. ¶¶ 4–5.  That complaint raises two claims.  The first is a § 1983 claim against Wilson for violation of his Fourth Amendment rights, based on allegations that Wilson "repeatedly molested [him] . . . without lawful justification" during the search.  Id. ¶¶ 61–62. The second is a common law battery claim under District of Columbia law against Wilson and the District of Columbia, arising out of the same allegations concerning the manner of the search. See id. ¶¶ 63–65.  Mwimanzi seeks declaratory relief, compensatory and punitive damages, and costs and fees.  See id. Prayer for Relief ¶¶ (a)–(e).

After the defendants answered, the parties entered discovery.  See Mar. 10, 2020 Scheduling Order.  Near the close of discovery, Mwimanzi informed the defendants that he planned to move to amend his complaint to add a claim related to Wilson's allegedly unlawful

decision to initiate a full search.  <u>See</u> Pl.'s Mot. Amend at 6, ECF No. 24.  Mwimanzi explained

that he decided to bring this new claim after hearing two statements in Wilson's deposition: (1)

that he had searched—not merely frisked—Mwimanzi for drugs, and (2) that he believed he had

authority to do so under MPD General Order 702.03.  <u>Id.</u> at 1, 5–6.

       Following a status conference, the court set a combined briefing schedule for the

following motions:  First, Mwimanzi has moved to amend his complaint to add a § 1983 claim

alleging that Officer Wilson's decision to initiate the search violated the Fourth Amendment.

<u>See</u> <u>id.</u> at 2.  On this new claim, Mwimanzi seeks to hold the District liable under <u>Monell v.</u>

<u>Department of Social Services of City of New York</u>, 436 U.S. 658 (1978), for creating a

municipal policy—D.C. Code § 23-524(g) and the implementing MPD General Order—that led

to his allegedly unlawful search.  <u>See</u> Proposed Am. Compl. ¶ 70, ECF No. 24-2.  The District

opposes this request.  <u>See</u> Def.'s Opp'n to Pl.'s Mot. Amend at 1, ECF No. 26.  Second, and

contingent on the Court's grant of leave to amend, Mwimanzi has moved for partial summary

judgment on his new claim.  <u>See</u> Pl.'s Combined Br. at 10–24.  The District again opposes.  <u>See</u>

Defs.' Reply to Pl.'s Opp'n & Opp'n to Pl.'s Contingent Mot. Summ. J. ("Defs.' Combined Br.")

at 17–25, ECF No. 34.  Third, the defendants have moved for summary judgment on the original

two manner-of-search claims.  <u>See</u> Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 27.  They

argue that there are no genuine disputes of material fact, and that the facts in the record cannot

support a finding of liability on either claim.  <u>See</u> <u>id.</u> at 6–9, 11–12.  Officer Wilson also claims

entitlement to qualified immunity on the § 1983 claim against him.  <u>See</u> <u>id.</u> at 9–11.  Mwimanzi

opposes this request for summary judgment.  <u>See</u> Pl.'s Combined Br. at 24–44.  These motions

are now ready for resolution.

## II.    Legal Standards

Federal Rule of Civil Procedure 15 generally governs motions to amend pleadings. Under Rule 15(a)(2), a party may amend its pleading after the time for amendment as a matter of course only with leave of court.  However, courts are instructed to "freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Whether to grant leave to amend is a decision left to the discretion of the district court.  Mowrer v. U.S. Dep't of Transp., 14 F.4th 723, 732 (D.C. Cir. 2021).  Leave may be properly denied if, among other things, "the proposed amendment is futil[e], . . .  such that it would not withstand a motion to dismiss."  Singletary v. Howard Univ., 939 F.3d 287, 295 (D.C. Cir. 2019) (internal citation and quotation marks omitted).  "A complaint will, in turn, survive a motion to dismiss if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Some courts in this district have instead applied Federal Rule of Civil Procedure 16 to motions to amend pleadings—like Mwimanzi's—filed after the time allotted for amendment in the case's scheduling order.  See Lovely-Coley v. District of Columbia, 255 F. Supp. 3d 1, 5 (D.D.C. 2017) (gathering cases).  Because Rule 16 allows modification of scheduling orders only "for good cause and with the judge's consent," Fed. R. Civ. P. 16(b)(4), applying this rule in effect raises the bar for later-filed amendment requests.  See Brooks v. Clinton, 841 F. Supp. 2d 287, 296 (D.D.C. 2012) (explaining that motions to amend filed after a scheduling order deadline are subject to "the more stringent 'good cause' standard of Rule 16(b)(4)").  When applying Rule 16, courts in this district have "focus[ed] on the reasons the plaintiff has given for his delay instead of the substance of the proposed amendment."  Lurie v. Mid-Atl. Permanente Med. Grp., P.C., 589 F. Supp. 2d 21, 23 (D.D.C. 2008); see also id. (explaining that "futility is a Rule 15(a)

consideration, not a Rule 16(b) consideration").  But see Adams Fam. Tr. v. John Hancock Life Ins. Co., 424 F. App'x 377, 381 n.9 (5th Cir. 2011) ("A futile amendment need not be allowed under Rule 16(b).")

The Court will grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if it is one 'that might affect the outcome of the suit under the governing law[.]'" Jeffries v. Barr, 965 F.3d 843, 859 (D.C. Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "And a dispute about a material fact 'is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 248).  In considering a motion for summary judgment, the Court "must view the evidence in the light most favorable to the opposing party." Tolan v. Cotton, 572 U.S. 650, 657 (internal quotation marks omitted).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and identifying portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant has carried this initial burden, the burden shifts to the party opposing summary judgment to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Jeffries, 965 F.3d at 859 (quoting Anderson, 477 U.S. at 256).

### III.  Analysis

The Court groups its analysis of the parties' motions according to the two relevant sets of claims.  First, the Court takes up Mwimanzi's § 1983 claim raising a Fourth Amendment challenge to the search's initiation.  As explained in Part III.A, below, the Court will grant Mwimanzi's request to amend his complaint to add this claim.  The Court also holds that

Mwimanzi is entitled to summary judgment on the limited facial challenge he makes to the statute and implementing MPD General Order.  Second, the Court considers the § 1983 and common law battery claims relating to the manner in which Officer Wilson searched Mwimanzi. The defendants have moved for summary judgment on these claims.  As outlined in Part III.B, below, the Court will largely deny that motion.  Officer Wilson's conduct during the search remains hotly contested.  And, when those disputes are resolved in Mwimanzi's favor, both his Fourth Amendment and battery claims mostly survive summary judgment.  However, the defendants are entitled to summary judgment to the limited extent that the manner-of-search claims challenge the legality of Wilson's decision to conduct more than a pat-down search.

A.  Initiation of Search Claim Against the District of Columbia

*1. Leave to amend*

In July 2021, Mwimanzi moved to amend his complaint to add a § 1983 claim against the District of Columbia, raising both facial and as-applied Fourth Amendment challenges to the D.C. statute and implementing MPD policy that Officer Wilson used to justify the search.  See Proposed Am. Compl. ¶¶ 66–70.   Explaining this belated amendment request, Mwimanzi notes that, until Wilson's May 2021 deposition, he was unaware Wilson intended to conduct a full search and did so in sole reliance on the warrant and MPD General Order 702.03.  See Pl.'s Mot. Amend at 1, 5–6.  Mwimanzi thus contends that he satisfies the standards for leave to amend under either Federal Rules of Civil Procedure 15 or 16(b).  See id. at 7–8.  The District does not object to the timeliness of the proposed amendment, nor does it discuss whether the Court should analyze this question under Rule 15(a)(2) or Rule 16(b).  Instead, the District argues only that the amendment should be denied as futile because the proposed challenges to D.C. Code § 23-524(g)

and MPD General Order 702.03 § VII(F)(8)(f) fail on the merits.  <u>See</u> Def.'s Opp'n to Pl.'s Mot. Amend at 4–11.

The Court will grant the motion to amend because it satisfies either possible standard. Under both Rule 15 and 16(b), courts will consider the timeliness of a request to amend.  <u>See</u> <u>Trudel v. SunTrust Bank</u>, 924 F.3d 1281, 1288 (D.C. Cir. 2019) ("'[U]ndue delay' is a valid ground for denying leave to amend under Rule 15(a).'"); <u>Lurie</u>, 589 F. Supp. 2d at 23 (focusing on "reasons" for "delay" under Rule 16(b)).  But the District has not challenged Mwimanzi's diligence or reasons for delay, and the Court sees no reason to do so.  The parties do disagree about whether the Court should also consider the merits of the proposed claim as part of its amendment inquiry.  <u>See</u> Pl.'s Combined Br. at 9 (suggesting that futility is not a relevant inquiry for this late-stage motion to amend); Def.'s Opp'n to Pl.'s Mot. Amend at 4–11 (asking Court to reject the amendment because the challenge would substantively fail).  The Court need not resolve this dispute because Mwimanzi's proposed claim would not be futile.  As explained in the following section, Mwimanzi is entitled to summary judgment on it.  The Court will therefore allow the amendment.

### 2.  *Summary judgment*

Mwimanzi challenges the D.C. Code provision defining the scope of acceptable searches under a premises search warrant, as well as the MPD General Order implementing that provision. This is a <u>Monell</u> claim.  With such a claim, Mwimanzi can hold the District liable for a constitutional violation committed by its employee only if a municipal policy was "the moving force behind the constitutional violation."  <u>Hurd v. District of Columbia</u>, 997 F.3d 332, 337 (D.C. Cir. 2021) (internal quotation marks omitted).  The Court therefore "must conduct a two-step inquiry," asking, first, whether there has been "a predicate constitutional violation," and,

second, whether "a custom or policy of the municipality caused the violation." Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  Mwimanzi has met his burden at each step of this inquiry.

> a.  Constitutional violation

In his first § 1983 claim, Mwimanzi challenges a segment of the reach of D.C. Code § 23-524(g) and MPD General Order 702.03:  where the statute and general order authorize the search of an individual for contraband named in a warrant and concealable on the body *solely* because that person is present at a residence where a search warrant is being executed. Mwimanzi primarily frames this as a "narrow" facial challenge to the statute and policy, although in the alternative asks the Court to evaluate an as-applied challenge.  See Pl.'s Combined Br. at 10.  As explained below, the Court will treat Mwimanzi's complaint as a limited facial challenge and concludes that he prevails on this claim at summary judgment.

> i.  *Facial challenge*

Before reaching the merits of Mwimanzi's claim, the Court addresses two preliminary questions about its structure.

*First* is whether the Court should treat Mwimanzi's claim as an as-applied challenge to the D.C. statute and MPD policy, or as a limited facial challenge to their applications in all cases like his.  The Court finds it can and will address Mwimanzi's facial challenge.  A facial challenge generally "attack[s] . . . a statute itself as opposed to a particular application."  City of Los Angeles v. Patel, 576 U.S. 409, 415 (2015).  However, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. FEC, 558 U.S. 310, 331 (2010).  In fact, a claim, like Mwimanzi's, may have

"characteristics of both"—"'as applied' in the sense that it does not seek to strike [a statute] in all its applications," but "'facial' in that it is not limited to plaintiff's particular case, but challenges application of the law more broadly." Doe v. Reed, 561 U.S. 186, 194 (2010). As plaintiff recognizes, at least on the merits, the legal questions presented by his alternative formulations largely overlap. See Mot. Hr'g Rough Tr. at 3:17–19. But because Mwimanzi seeks relief that would "reach beyond [his] particular circumstances," he must "satisfy [the] standards for a facial challenge to the extent of that reach." Reed, 561 U.S. at 194.

Those standards require Mwimanzi to "'establish that no set of circumstances exists under which the [challenged provisions] would be valid,'" or show that they "lack[] 'a plainly legitimate sweep,'" at least as to the subset of applications covered by his limited challenge. Ams. for Prosperity Found. v. Bonta, 141 S. Ct. 2373, 2387 (2021) (first quoting United States v. Salerno, 481 U.S. 739, 745 (1987), then quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)). But as the Supreme Court has explained, the relevant circumstances for the purpose of a facial challenge are only those that "involve actual applications of the statute." Patel, 576 U.S. at 418–19. For challenges to provisions authorizing searches, then, "the proper focus of the constitutional inquiry is searches that the law actually authorizes"—not ones independently authorized by other sources of law and for which the statute is, accordingly, "irrelevant." Id.

*Second* is whether Mwimanzi himself falls into the relevant subset of cases covered by his "narrow" facial challenge, entitling him to bring such a claim. The Court is assured that he does. Again, Mwimanzi limits his claim to the statute and general order's authorization "to search people based exclusively on their presence in a residence subject to a warrant." Pl.'s Combined Br. at 13. Even when any disputed facts are construed in the District's favor, that

describes Mwimanzi's search.  Officer Wilson testified that he searched Mwimanzi based only

on the warrant and the guidance in the MPD General Order allowing him to search anyone

present who might reasonably be hiding contraband named in the warrant.[5]  See Pl.'s SMF III, ¶¶

8, 16; Defs.' Resps. to Pl.'s SMF III, ¶¶ 8, 15–16.  The warrant here authorized only the search

of the Quebec Place apartment.  It did not name any individual, and certainly not Mr. Mwimanzi.

See Warrant & Aff. at 1.  And as the District concedes, no exceptions to the warrant requirement

could have separately authorized the search.  See Mot. Hr'g Rough Tr. at 6:22–7:2.

Moreover, nothing the MPD officers knew outside of the warrant cast suspicion on

Mwimanzi.  As just explained, neither the warrant nor the affidavit focuses on Mwimanzi in any

way.  See Warrant & Aff. at 1, 3 (only identifying or describing Ms. Whitehead in affidavit).

Nor, the Court finds, do they suggest that *any* visitor to the Quebec Place apartment was

involved in narcotics dealing.  The District disputes this conclusion, pointing to statements in the

warrant affidavit outlining drug complaints about the property, reports of "heavy foot traffic" in

and out of the apartment, and observations by a confidential informant of alleged drug sales in or

near the premises.  See Mot. Hr'g Rough Tr. at 20:2–21:18 (discussing "plus factors"); Warrant

& Aff. at 3–4.  That evidence may have been sufficient to establish probable cause to search the

apartment, see United States v. Warren, 42 F.3d 647, 652 (D.C. Cir. 1994), but it did not cast

sufficient suspicion on anyone present in the apartment—no matter how brief or infrequent his

visit(s), see infra Part III.A.2.ii.  Nor did the police find anything while executing the warrant but

before searching Mwimanzi that could separately give rise to any suspicion that he was involved

---

[5] Wilson's invocation of the MPD General Order rather than the relevant code provision
is irrelevant.  The MPD General Order parrots the statute in all relevant ways, and the District
has elsewhere stated that D.C. Code § 23-524(g) was the basis for the search.  See Pl.'s SMF III,
¶ 16; Pl.'s Ex. E ¶ 4.

in wrongdoing.  Wilson has conceded that he did not hear any commotion after the police knocked—suggesting an attempt to hide evidence or flee.  See Defs.' Resps. to Pl.'s SMF III, ¶ 2.  He likewise did not see any drugs or drug paraphernalia in the apartment, nor any evidence of drug sales among the occupants, prior to conducting the search.  See id. ¶ 4.  Mwimanzi therefore experienced just the type of search he challenges:  one where a warrant to search the premises is used to justify the search of an otherwise suspicionless individual found inside.

### ii.   Merits

The Fourth Amendment generally requires a warrant supported by probable cause, or an exception to the warrant requirement, before law enforcement can search an individual. Missouri v. McNeely, 569 U.S. 141, 148 (2013).  Mwimanzi argues that the challenged provisions violate the Fourth Amendment because they authorize searches that go beyond the scope of a premises warrant and that are unsupported by probable cause.  See Pl.'s Combined Br. at 15–16 (citing Ybarra, 444 U.S. 85).  The District counters that the provisions cannot violate the Fourth Amendment because, in its reading, they already include a reasonableness requirement that matches the Fourth Amendment's limitations.  See Defs.' Combined Br. at 18–19.  The District also maintains that the statute is constitutional because Supreme Court and D.C. Circuit case law do not establish that a warrant for a place "can *never* authorize searches of individuals at that location."  Id. at 19.  The Court largely agrees with Mwimanzi and holds that, as to this subset of applications, the statute authorizes searches that the Fourth Amendment does not.

The Court begins, briefly, by reviewing what the relevant D.C. Code and MPD General Order provisions authorize.  In so doing, the Court rejects the District's assertion that they already incorporate the Fourth Amendment's reasonableness standard.  The relevant provisions

authorize officers "executing a warrant directing a search of premises or a vehicle [to] search any person therein . . . to the extent reasonably necessary to find property enumerated in the warrant which may be concealed upon the person."  D.C. Code § 23-524(g); see also MPD General Order 702.03 § VII(F)(8)(f) (allowing same).  The Court reads the provisions' reasonableness language to focus on the nature and concealability of the items sought, not the mechanisms or justifications for the search.  This reading flows from the grammar of the two phrases, each of which ties the word "reasonably" to the need to find property.  See D.C. Code § 23-524(g)(2) (allowing search of individuals "to the extent reasonably necessary to find property"); MPD General Order 702.03 § VII(F)(8)(f) (authorizing searches "to the extent reasonably necessary to . . . find contraband or property").  It also aligns with the interpretation of the D.C. Court of Appeals, to which this Court generally defers on issues of D.C. law.  See Williams v. Martinez, 586 F.3d 995, 1001 (D.C. Cir. 2009).  According to that court, the statute's "reasonable limitations" allow a search for things like "narcotics[,] . . . which could be secreted on the person," but not, for example, "a stolen television," which could not.  United States v. Miller, 298 A.2d 34, 36 n.6 (D.C. 1972).  This focus on the items to be found differs from the Fourth Amendment's reasonableness inquiry.  Under that provision, courts instead ask questions such as "whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed," or whether "the degree to which it intrudes upon an individual's privacy" is outweighed by "the degree to which it is needed for the promotion of legitimate government interests."  Wyoming v. Houghton, 526 U.S. 295, 299–300 (1999).  D.C. Code § 23-524(g) does not by its terms incorporate any Fourth Amendment limitations.[6]

---

[6] In its discussion of the statute's reasonableness requirement, the District cites two D.C. Court of Appeals decisions that, it claims, suggest the statute is "consistent with the Fourth

Turning to the merits, the Court begins with the Supreme Court case at the center of Mwimanzi's claim: Ybarra v. Illinois. In Ybarra, the Supreme Court held unconstitutional a search and seizure of a patron in a public tavern for which police had obtained a lawful premises warrant. See 444 U.S. at 91, 96. The Court explained that a search must be "supported by probable cause particularized with respect to that person," and that there was no probable cause to search Ybarra because "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id. at 91. The Court further noted that "a warrant to search a place cannot normally be construed to authorize a search of each individual in that place." Id. at 92 n.4.

Ybarra does not directly dictate the outcome of this case. Ybarra addressed a search of a patron in a commercial establishment, and the Court emphasized that "the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." Id. at 91. In later cases, both the Supreme Court and the D.C. Circuit have distinguished Ybarra on the ground that the suspect there was only coincidentally found in a public place. For instance, in the context of automobile searches, the Supreme Court has noted that passengers in private cars—"unlike the unwitting tavern patron in Ybarra—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the

--------------------------------------

Amendment." See Defs.' Combined Br. at 24–25 (citing Miller, 298 A.2d at 36 n.6; Thomas v. United States, 352 A.2d 390, 391 (D.C. 1976)). But as the D.C. Court of Appeals has noted, those cases predate Ybarra, so do not indicate whether section 23-524(g) remains constitutional. White v. United States, 512 A.2d 283, 286 (D.C. 1986). In fact, the constitutionality of this provision has been an open question for more than three decades. See id. at 285 (expressly declining to decide constitutionality and instead remanding for further factfinding on whether other facts—such as the defendant's disputed attempt to flee the house being searched—could separately support a search and arrest).

fruits or the evidence of their wrongdoing." Houghton, 526 U.S. at 304–05 (upholding search of

passenger's bag); see also Maryland v. Pringle, 540 U.S. 366, 373–74 (2003) (upholding

passenger's arrest and search).  The D.C. Circuit has applied similar reasoning when discussing

police encounters with those found in private homes where contraband had been uncovered.  As

that court explained, "[c]ommon sense suggests that there is a much greater likelihood that a

person found in a small private residence containing drugs will be involved in the drug activity

occurring there than an individual who happens to be in a public tavern where the bartender is

suspected of possessing drugs." United States v. Reid, 997 F.2d 1576, 1578–79 (D.C. Cir. 1993)

(upholding frisk of visitor leaving apartment at time warrant was executed).

     But the Court disagrees with the District's suggestion that later case law forecloses

extending Ybarra to private residences.  Nor is there any support for its claim that courts have

"dr[awn] back" from any of Ybarra's most relevant lessons, even as they distinguished it in

various contexts.  See Defs.' Combined Br. at 19–20 (quoting Germany v. United States, 984

A.2d 1217, 1224 (D.C. 2009)).  To the contrary, the Court reads the relevant cases to suggest that

extending Ybarra's lessons to the limited subset of cases at the heart of Mwimanzi's challenge is

necessary to preserve the Fourth Amendment's bedrock requirements of both a warrant and

probable cause.

     The Court's conclusion hews to the Fourth Amendment's requirement that a search be

supported by a warrant or an exception to the warrant requirement.  Mitchell v. Wisconsin, 139

S. Ct. 2525, 2533 (2019) (explaining that "our precedent normally requires a warrant for a lawful

search," absent some "well-defined exceptions").  To be valid, a warrant must contain a

particular description of the "place to be searched[] and the persons or things to be seized." U.S.

Const. amend. IV; see also Groh v. Ramirez, 540 U.S. 551, 557–58 (2004) (noting that

warrant—either itself or through proper incorporation by reference—must particularly describe both the place of the search and the persons or things to be seized); Doe v. Groody, 361 F.3d 232, 239 (3d Cir. 2004) (describing amendment's "requirement of a particular description *in writing*").  Reading a warrant authorizing only the search of a *place* to cover the search of a *person*, too, would undermine this foundational requirement.  That the place named in the warrant is a private residence rather than a public establishment is irrelevant.  See United States v. Branch, 545 F.2d 177, 181 (D.C. Cir. 1976) (recognizing that a warrant to search an apartment "did not authorize the search of all persons who may have been present" (citing United States v. Di Re, 332 U.S. 581 (1948)).  A warrant cannot silently authorize searches, whatever type of premises it covers.

The Court's rule also ensures that individuals will not be searched without probable cause.  Because individuals in Mwimanzi's position were neither named nor described—even generally—in the search warrant, there is no assurance that any neutral magistrate concluded there was probable cause to search them.  See Pitts v. District of Columbia, 177 F. Supp. 3d 347, 373 (D.D.C. 2016) (holding that "search cannot be supported by the probable cause determination made by the magistrate judge in issuing the warrant, which applied only to the apartment and not its occupants").  Nor is presence in a private residence covered by a search warrant enough—standing alone—to give rise to probable cause.  See White v. United States, 512 A.2d 283, 286 (D.C. 1986) (reasoning that building's status as a private home "did not give the police probable cause to believe that appellant, one of five persons in the house at the time of the search, was committing a crime or concealing property which they were entitled to seize"); 2 LaFave Search & Seizure § 4.9(c) (6th ed. Dec. 2021 update) (explaining that analysis differs when place to be searched is private premises, but noting that "the requisite probable cause is

most likely to be deemed present" when other factors tie a person to the premises or the alleged

wrongdoing).  Notably, the D.C. Circuit has held that presence in "a small private residence

containing drugs" was only barely sufficient to justify a <u>Terry</u> frisk—calling the decision a

"particularly close call." <u>Reid</u>, 997 F.2d at 1577–79.  That logic suggests that presence in a

private residence subject to a search warrant is not enough to support the more stringent probable

cause standard.

  None of the cases the District cites suggests that <u>Ybarra</u>'s rule *cannot* be extended to

private residences, particularly where presence in the home is the *only* factor tying the individual

to the contraband sought in the premises warrant.  Crucially, each case involved something other

than the personal search of an individual based on a warrant to search a residence.  For example,

several addressed protective detentions of individuals during the execution of a search warrant,

which do not require either probable cause or coverage of the individuals in the warrant.  <u>See,

e.g.</u>, <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981) (authorizing detention during execution of

search warrant); <u>Muehler v. Mena</u>, 544 U.S. 93, 102 (2005) (upholding use of handcuffs to

effectuate detention during search); <u>Los Angeles Cnty. v. Rettele</u>, 550 U.S. 609, 614–15 (2007)

(per curiam) (rejecting § 1983 challenge to detention to "secure the room" during execution of

warrant).  Several more involved <u>Terry</u> frisks—an exception to the warrant requirement that

requires a lower showing of reasonable suspicion, rather than probable cause.  <u>See Reid</u>, 997

F.2d at 1577–79; <u>Germany</u>, 984 A.2d at 1224.[7]  And still others involved searches of personal

---

[7] The District cites language in <u>Germany</u> observing that the Supreme Court "drew back somewhat from" the particularized suspicion requirement after <u>Ybarra</u>.  <u>See</u> Defs.' Combined Br. at 19–20 (quoting <u>Germany</u>, 984 A.2d at 1224).  So far as it is accurate, that statement is irrelevant to the question here.  The D.C. Court of Appeals based this observation on the Supreme Court detention case law discussed above, and deployed it to evaluate the propriety of a <u>Terry</u> frisk.  The standards for intrusion are far lower in both those contexts.  There is no

belongings, which do not intrude "upon cherished personal security" in the way that "[e]ven a limited search of the outer clothing" does.  Houghton, 526 U.S. at 303 (allowing search of passenger's personal belongings inside car); see also Walker v. United States, 327 F.2d 597, 600 (D.C. Cir. 1963) (upholding search of wallet and bag that individuals were passing between them, as to hold otherwise "would be to suggest that a warrant to search premises may be frustrated by the device of simply picking up the guilty object and holding it in one's hand"); Branch, 545 F.2d at 182 (suggesting that visitor's "personal items . . . may, in some circumstances, be found to be within the ambit of a premises search warrant," but concluding that shoulder bag was not in that instance).

In the two cases the District cites where courts upheld a full search of an individual present in a private residence subject to a search warrant, other facts on the ground were sufficient to both establish probable cause *and* trigger an exception to the warrant requirement. In particular, each was ultimately upheld as a valid search incident to arrest.  See United States v. Powell, 483 F.3d 836, 839 (D.C. Cir. 2007) (explaining that warrantless search is valid if police had probable cause to arrest prior to the search and a "formal arrest followed quickly on the heels of the challenged search").  For example, in United States v. Holder, the D.C. Circuit upheld the search of an individual who was present in a private residence at the time the police executed a search warrant, and who was found standing near "a drug-laden table . . . indicating that a crime was in progress."  990 F.2d 1327, 1328–29 (D.C. Cir. 1993).  The court found Ybarra inapplicable because the defendant's "presence in a private apartment just a few feet from a table

_____

indication the Supreme Court has in fact drawn back from the fundamental requirement of particularized suspicion for full searches.

full of cocaine can hardly be" described as "innocent." Id. at 1329. Crucially, however, the court applied this observation to uphold an *arrest*, and then upheld the subsequent search without reference to the warrant. Id. at 1328–29. Likewise inapposite is Washington v. District of Columbia, in which another court in this district rejected a store owner's challenge to his arrest and search during the execution of a warrant to search the premises for material related to an illegal lottery. 685 F. Supp. 264, 267–69, 276–77 (D.D.C. 1988). To be sure, the opinion there cited D.C. Code § 23-524(g) and observed that, at least under those circumstances, police officers could reasonably "conclude they had probable cause to believe that the objects named in the search warrant were on the person of [the store owner]." Id. at 276 & n.31. But it did not uphold the search based on the warrant for the store alone. Rather, the search of the market had "uncovered important evidence" implicating the owner, so the court found sufficient probable cause to both arrest him and "then search him incident to that arrest." Id. at 275, 276–77. Because neither D.C. Code § 23-524(g) nor the MPD General Order "actually authorize[d]" the searches in either instance, these cases do not implicate the questions raised by Mwimanzi's facial challenge to those provisions. Patel, 576 U.S. at 418.

The Court also finds support for its conclusion in the case law of at least two other circuits that have likewise rejected personal searches in this context. For instance, in Doe v. Groody, the Third Circuit found that the search of a woman and her young daughter—who were not named in the warrant for the apartment—violated the Fourth Amendment because "[a] search warrant for a premises does not constitute a license to search everyone inside." 361 F.3d at 243. The court refused to accept that "the ease with which contraband could be concealed on those present in the searched premises" justified the personal searches, explaining that the Supreme Court had "rejected" that reasoning. Id. (citing Ybarra, 444 U.S. at 94–96). The Tenth Circuit,

too, has held that a warrant authorizing a search of a residence for evidence of illegal betting material did not justify the frisk and search even of the individual who lived there.  United States v. Ward, 682 F.2d 876, 881 (10th Cir. 1982).  While the court recognized that "the Fourth Amendment violation . . . may have been readily avoided had the search warrant been drafted to include a search of [the defendant's] person," the Tenth Circuit reasoned that the warrant requirement mandated its holding.  Id.  The same principles apply to the provisions at issue here.

In a last gasp, the District resorts to unwarranted fear mongering.  At oral argument, the District claimed that even partially invalidating D.C. Code § 23-524(g) and MPD General Order 702.03 would have "serious implications" for police practice, "completely strip[ping] an officer's ability to execute a search warrant" and leading, apparently inevitably, to an increase in "criminal behavior."  Mot. Hr'g Rough Tr. at 21:19–23, 32:10–11.  To the extent this argument is even legally relevant, the District overstates the consequences and ignores the other tools available to law enforcement.  Police executing a warrant for a private residence where drug activity is suspected may conduct a pat-down frisk of visitors, Reid, 997 F.2d at 1578–79; Germany, 984 A.2d at 1230–31, as they appropriately did here.  Those present at the execution of a warrant therefore will not be able to escape scrutiny just by "stash[ing] everything in their pockets."  Mot. Hr'g Rough Tr. at 32:7–10.  In addition, police may detain occupants while executing a warrant covering a residence.  Summers, 452 U.S. at 705.  If the search of the premises ultimately raises sufficient concern that there is a "possible connection of that individual with the property named in the warrant," or a risk that the individual is trying to "remov[e] the property specified in the warrant," police could then constitutionally search the detained visitors under various exceptions to the warrant requirement.  See 2 LaFave Search & Seizure § 4.9(c).  That is precisely the scenario presented in the cases cited above, where courts

upheld searches as incident to arrest, rather than as authorized by a premises warrant.  Finally, the police may be able to apply for warrants that would explicitly authorize them to search persons found inside a residence named in the warrant.  See id. § 4.5(e) (describing split in authority over whether warrants to search "all persons found" in a property are impermissible "general" warrants).  Given all these avenues to achieve similar ends, the Court concludes that the challenged portions of D.C. Code § 23-524(g) and the implementing general order are not necessary to enable law enforcement to ferret out contraband in situations like this one.

Accordingly, the Court holds that D.C. Code § 23-524(g) and MPD General Order 702.03 § VII(F)(8)(f) are unconstitutional to the extent they authorize searches of individuals solely based on their presence in a private residence covered by a search warrant.  Because such searches violate the Fourth Amendment, Mwimanzi has satisfied his burden to establish a facial constitutional violation.

b.   Municipal liability

Having found a constitutional violation, the Court turns to the second step of the Monell analysis:  whether "the municipality is moving force behind the constitutional violation."  Hurd, 997 F.3d at 337 (internal quotation marks omitted).  Although the District asserted in its briefing that Mwimanzi had not satisfied his burden on this point, it chose at oral argument not to press that argument further.  See Mot. Hr'g Rough Tr. at 27:7–16.  That was a wise choice, as the question here is easy.  Mwimanzi has made a facial challenge to a D.C. statute and an MPD General Order implementing it.  The Court has now held that these provisions violate the Fourth Amendment in the subset of cases he identifies, and that Mwimanzi falls into the relevant group.

Because the municipality has "adopt[ed] a policy that itself violates the Constitution," Hurd, 997 F.3d at 337, Mwimanzi has established that the city was the driving force behind the violation.

B.  Manner-of-Search Claims

The Court now turns to Mwimanzi's second set of claims: another under § 1983, brought against Officer Wilson, and one for common law battery, brought against both Wilson and the District.  These claims both challenge the way Wilson conducted the search, alleging that the significant force applied to manipulate Mwimanzi's testicles and search around his groin was unlawful.  The defendants have move for summary judgment on these claims.  Although the legal standards for each differ in several respects, the Court reaches the same conclusions.  As explained below, the defendants have not met their summary judgment burden as to a portion of each claim—focused on the allegedly aggressive, forceful, and invasive manner of the search of Mwimanzi's groin.  But to the extent Mwimanzi's challenge focuses on the fact of the invasion itself—objecting to any search of the groin area beyond what is allowed in a simple pat-down—it cannot survive summary judgment.

*1.  Section 1983 claim against Officer Wilson*

With this § 1983 claim, Mwimanzi alleges that the way Officer Wilson conducted the search violated the Fourth Amendment in three ways: (1) "[b]y fondling his testicles and probing his buttocks so forcefully that the pain lingered for days, for no legitimate investigative purpose"; (2) "[b]y manipulating his testicles based solely on his presence in a residence subject to a warrant"; and (3) "[b]y probing his buttocks based solely on his presence in a residence subject to a warrant."  Pl.'s Combined Br. at 30.  The first allegation resembles a traditional unreasonable search or excessive force claim.  The latter two can be grouped together, as they both focus on the fact of intrusion into Mwimanzi's genital area.  Officer Wilson has generally

moved for summary judgment, although he does not address these two types of allegations separately.  The Court addresses each group of allegations below.

On each, qualified immunity grounds the Court's analysis.  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted).  The unlawfulness of conduct is clearly established if, "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing is unlawful.'"  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate," such that it was "settled law."  Id. (internal quotation marks omitted).  To be settled law, the relevant legal principle must be "dictated by controlling authority or a robust consensus of cases of persuasive authority."  Id. at 589–90 (internal citations and quotation marks omitted).  In addition, the Supreme Court has instructed courts not to "define clearly established law at a high level of generality."  Id. at 590.  "A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established."  Id. (internal quotation marks omitted).

a.  Claim relating to use of force during search

The court begins with the part of Mwimanzi's manner-of-search claim challenging, in his view, the particularly aggressive and intrusive use of force in probing his groin and buttocks.  On these allegations, the relevant standard on the merits is objective reasonableness.  Cnty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546 (2017).  "A police officer's use of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and

quality of the intrusion on the individual's Fourth Amendment interests' is weightier than 'the countervailing governmental interests at stake.'" Rudder v. Williams, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  In making this evaluation, courts "pay careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether []he is actively resisting arrest or attempting to evade arrest by flight." Hall v. District of Columbia, 867 F.3d 138, 157 (D.C. Cir. 2017) (internal quotation marks omitted); see also Bell v. Wolfish, 441 U.S. 520, 559 (1979) (directing courts evaluating reasonableness of search method to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted").

Wilson argues that the search was reasonable as a matter of law, and in the alternative asserts qualified immunity.  See Defs.' MSJ at 6–11.  The Court will first look at whether Mwimanzi has put forward sufficient evidence of a violation to survive summary judgment, and then will consider whether the nature of this violation was clearly established at the time of the search, in January 2019.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (giving courts flexibility in which prong of the qualified immunity analysis they tackle first).  The answer to both questions is yes.

Mwimanzi has offered sufficient evidence to create a question of fact as to whether Officer Wilson's conduct violated the Fourth Amendment's reasonableness standard.  Mwimanzi testified that Wilson aggressively squeezed his testicles and probed his anus, to the point that the encounter left him humiliated and in severe pain.  See Pl.'s SMF II, ¶¶ 23, 26, 36–39.  A reasonable jury could credit this recounting of the facts, and none of Wilson's arguments to the contrary are convincing.  Wilson first contends that Mwimanzi cannot rely on his deposition

testimony because it is "self-serving and do[es] not show that Officer Wilson used excessive force." Defs.' Combined Br. at 11. But deposition testimony from an individual with personal knowledge of the event is competent evidence that can create a genuine issue of fact. See Camara v. Mastro's Restaurants LLC, 952 F.3d 372, 374–75 (D.C. Cir. 2020) ("[T]he term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."); Fed. R. Civ. P. 56(c)(1) (listing deposition testimony as acceptable evidence at summary judgment). Of course, arguments about the testimony's self-serving nature and the lack of corroboration may be relevant to the merits. A jury could very well find that Mwimanzi's account is exaggerated or unbelievable. But that is a question of credibility that the Court must leave for the jury.

Wilson also argues that the body-worn camera footage contradicts Mwimanzi's story. See Defs.' MSJ at 8–9, 11–12 (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). The Court has reviewed the relevant video footage. While Wilson may be correct that Mwimanzi's reaction to the search does not entirely square with his later narrative, the footage is largely unhelpful on the ultimate question of reasonableness. Throughout, the camera focuses on Mwimanzi's jacket or the floor—not his buttocks or groin or Wilson's hands. The video footage thus cannot resolve any of the most relevant disputes. Wilson attempts to identify several specific discrepancies between the footage and Mwimanzi's testimony, but they are unconvincing. Several supposed inconsistencies go only to how Mwimanzi *characterized* the encounter when describing it later. See, e.g., Defs.' MSJ at 8 (complaining that video did not show Mwimanzi's claimed "flinch" or "gasp"). Others are immaterial. See, e.g., Defs.' Combined Br. at 9 (faulting plaintiff's brief for stating that Wilson told him to spread his legs, when Wilson in fact instructed him to spread his feet). At most, these are questions of semantic parsing and credibility best left to a jury.

Because the video neither clearly portrays the incident nor directly contradicts Mwimanzi's account, genuine disputes of material fact remain as to how Wilson conducted the search.  See Fenwick v. Pudimott, 778 F.3d 133, 137–38 (D.C. Cir. 2015) (approvingly citing district court's observation that, where videotape "provides no ready answers to the factual dispute," it "does little" to affect court's analysis).

When those issues of material fact are resolved in Mwimanzi's favor, the record would support a finding that the excessively intrusive and forceful search of his groin area violated the Fourth Amendment.  Again, the touchstone here is objective reasonableness, which must be evaluated by "the facts and circumstances" of the case, including "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted."  Johnson v. District of Columbia, 528 F.3d 969, 974 (D.C. Cir. 2008) (cleaned up).  On the most basic level, the Court does not see how the type of force Mwimanzi testified to—including fondling and squeezing his testicles against his leg to the point of severe pain— was necessary to effectuate a narcotics search.  Several other courts in this district have reached a similar conclusion, noting that an officer's forceful and intrusive search of an individual's genitals, beyond what is needed to recover any contraband, may violate the Fourth Amendment. Particularly instructive is a case with remarkably similar facts:  Dickey v. United States, 174 F. Supp. 3d 366 (D.D.C. 2016).  There, Judge Sullivan addressed a claim that a police officer violated the Fourth Amendment by "search[ing] and fondl[ing]" the plaintiff's "genitals and penis and intentionally humiliat[ing]" him "by searching his genital region" repeatedly in public. 174 F. Supp. 3d at 370.  At the motion to dismiss stage, Judge Sullivan refused to hold that a search conducted in the way the plaintiff alleged was reasonable as a matter of law.  Id. at 370– 71.  Instead, the court found the plaintiff had stated a claim for an unreasonable search with his

"alleg[ation] that his genitals were fondled in such a way as to constitute a 'sexual assault.'"  Id. at 371.  Also instructive is Grissom v. District of Columbia, where the court likewise held that a Fourth Amendment claim arising out of an allegedly invasive search survived a motion to dismiss.  See 853 F. Supp. 2d 118, 125–26 (D.D.C. 2012).  As Judge Boasberg explained, if the plaintiff could provide evidence that a security officer used a "magnetometer . . . to rub her genitals" and continued to search her "after she asked the officers to stop," she at least "might succeed in proving that the search was unreasonable under the circumstances."  Id.

As in Dickey and Grissom, should a jury believe Mwimanzi's version of what happened, the scope, manner, and context of the search all could support a finding that Wilson's conduct was unreasonable.  Of course, some contact with the groin and genitals may be an inevitable and constitutionally permissible part of law enforcement search tactics.  Cf. Terry v. Ohio, 392 U.S. 1, 17 n.13 (1968) (contemplating search of "the groin and area about the testicles"); Defs.' SMF ¶ 18 (noting Officer Wilson's testimony that drugs are often hidden in an individual's groin area).  But "[a] thorough search of the groin area is distinct from the fondling of genitalia," Dickey, 174 F. Supp. 3d at 372, and the latter is what Mwimanzi testified happened here.

Moreover, Mwimanzi has claimed that the search not only was unduly invasive but also involved an especially aggressive use of force.  See, e.g., Pl.'s SMF II, ¶ 23 (describing Wilson using "the power of his hands to squeeze" each testicle).  Use of force to effectuate a search can separately render it unreasonable.  See Mendez, 137 S. Ct. at 1546–47; Sherrod v. McHugh, 334 F. Supp. 3d 219, 248 (D.D.C. 2018); 3 LaFave Search & Seizure § 5.2(i) ("While it is thus clear that the police may use reasonable force in an effort to prevent the loss of the evidence, it is also clear that if the force is excessive then the police have engaged in an unconstitutional act . . . .").  To support his allegation as to the amount of force used, Mwimanzi testified to pain both during

and after the search, causing injuries that lasted for weeks.  See Pl.'s SMF II, ¶¶ 36–39.  The

"severity of" the injury is "relevant" to the constitutionality of the officer's act, even if not itself

dispositive.  Dormu v. District of Columbia, 795 F. Supp. 2d 7, 22 (D.D.C. 2011) (discussing

Wardlaw v. Pickett, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993)).  Finally, the context of the search

could also support a finding of unreasonableness.[8]  Mwimanzi has put forward evidence that he

was subjected to an invasive genital search in front of friends and acquaintances, well beyond

what was needed to search him for narcotics.  While this may not be as unreasonable as the

degrading public searches at issue in Grissom and Dickey, the Court at this stage credits

Mwimanzi's unrebutted testimony that the invasive and semi-public nature of the search resulted

in social humiliation and stigma.  See Pl.'s SMF II, ¶¶ 44–46.

Wilson's final argument on the merits is that Mwimanzi's claim cannot survive summary

judgment because he has not offered a police practices expert to provide the jury with a standard

for reasonable search practices.  See Defs.' MSJ at 8.  The Court disagrees.  Wilson draws this

requirement from a series of medical malpractice cases.  See Lasley v. Georgetown Univ., 688

A.2d 1381, 1385 (D.C. 1997); Washington v. Washington Hosp. Ctr., 579 A.2d 177, 181 (D.C.

1990).  There, expert testimony on scientific or professional issues may be especially necessary

---

[8] Mwimanzi also contends that Wilson's search was particularly unreasonable because he had already been either frisked or searched at least twice that evening.  See Pl.'s Combined Br. at 36–37.  The parties dispute the exact nature of at least one of those previous encounters, by fellow Officer Jose Seijo, which Mwimanzi claims constituted a "full search" and Officer Wilson says was—at least as far as he knew—at most a pat down.  See Defs.' SMF ¶ 17; Pl.'s SMF I, ¶ 17.  Neither the body-worn camera footage nor the parties' deposition testimony resolves this disagreement, so there remains a genuine issue of fact as to whether Mwimanzi had previously been subject to a full search, and whether Officer Wilson was aware of that fact.  Still, this finding is not necessary to the Court's holding here.  Officer Wilson would not be entitled to summary judgment on this portion of the unreasonable search claim even if he were right about the nature of Mwimanzi's previous encounters with the police that night.

for a jury to evaluate issues like the standard of care and causation.  See Lasley, 688 A.2d at

1384–85.  But Wilson does not point to any cases, in this Circuit or elsewhere, mandating the

introduction of expert testimony—on pain of dismissal—in a Fourth Amendment excessive force

case.  To the contrary, "expert testimony is by no means required in all excessive force cases,"

even as it may "in some instances . . . assist the jury in determining whether an officer used

excessive force."  United States v. DiSantis, 565 F.3d 354, 364 (7th Cir. 2009); see also id.

("Since the question of excessive force is so fact-intensive, the jury will often be in as good a

position as the experts to decide whether the officer's conduct was objectively reasonable."

(internal quotation marks omitted)); Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010)

(evidence to support finding of excessive force "may be in the form of expert testimony, lay

testimony, or other evidence, as long as the jury could evaluate the reasonableness of [the

officer's] conduct" (internal quotation marks omitted)).  Whether an officer may reasonably

fondle, squeeze, or forcefully probe the genitals and buttocks during an ordinary search is a

question that a lay jury may properly evaluate.

Turning to the second step of the qualified immunity analysis, the Court concludes that

there was a robust consensus of authority as of January 2019 to clearly establish that such an

excessively forceful and invasive search of an individual's genitalia would violate the Fourth

Amendment.  The Court's "review of the cases" convinces it that Wilson's "alleged use of

excessive force violated a clearly established rule: An officer's act of violence violates the

Fourth Amendment's prohibition against unreasonable seizures if it furthers no governmental

interest, such as apprehending a suspect or protecting an officer or the public."  Johnson, 528

F.3d at 976 (concluding that officer should have known that gratuitously violent kicking of

suspect in the groin violated clearly established law).  More specifically, as of the search here, at

least one court in this district had held "that any reasonable officer would have understood that . . . repeatedly fondling an individual's genitals" during a search "would constitute a violation of that person[']s clearly established constitutional rights." Dickey, 174 F. Supp. 3d at 371; see also Pl.'s Ex. G, Oral Pronouncement of Judge Jackson in Horse v. District of Columbia, No. 17-cv-1216-ABJ, at 77:11–13 (D.D.C. Sept. 27, 2019) ("The Court finds that the right to be free from a sexually intrusive search when conducted without probable cause is a clearly established right.").

Several other circuits had likewise found that such conduct violated the Fourth Amendment. Most notably, the Ninth Circuit held more than twenty years ago that causing plaintiffs "extreme pain by deliberately grabbing, pulling, and squeezing their testicles" during a pat-down search violated their Fourth Amendment rights and "clearly [lay] outside the protective realm of qualified immunity." Price v. Kramer, 200 F.3d 1237, 1249 (9th Cir. 2000); see also Washington v. Hively, 695 F.3d 641, 642, 644 (7th Cir. 2012) (reviving § 1983 claim arising out of allegations that jail guard "gratuitously fondl[ed] the plaintiff's testicles and penis" during search). While there are no Supreme Court or D.C. Circuit cases holding the same, the Court does not find this to be a particularly difficult question, given the stark nature of the allegations and Officer Wilson's failure to put forward any justification for the way, according to Mwimanzi, he conducted the search. The Court thus finds a robust consensus of persuasive authority that would have put any reasonable officer on notice that an aggressive and invasive search, involving gratuitous and painful fondling of an individual's genitals and buttocks, violated the Fourth Amendment.

The Court is unpersuaded by Officer Wilson's repeated reference to his good faith belief in the lawfulness of his conduct. See Defs.' Combined Br. at 15–16. Wilson asserts only that he

believed the *decision to search* was authorized by the warrant and MPD General Order 702.03.
Id.  But for this claim, the relevant question is whether Wilson thought he could aggressively
fondle and probe Mwimanzi's genital area and buttocks.  Wilson, perhaps unsurprisingly, has not
professed to holding such a belief.  And even if he had, it would be irrelevant to the qualified
immunity analysis.  Cf. Scott v. District of Columbia, 101 F.3d 748, 759 (D.C. Cir. 1996)
(explaining that in this circuit "good faith" is not a "relevant consideration in determining
whether qualified immunity shields an officer from liability for damages" for excessive force
claims); Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982) (refocusing qualified immunity inquiry
away from "subjective good faith of government officials").  Officer Wilson is therefore not
entitled to qualified immunity on this portion of the § 1983 claim against him.

As a result, Mwimanzi's claim as to the forceful and invasive nature of his search cannot
be resolved at summary judgment.  Whether the search occurred in the way Mwimanzi
described, as well as whether such conduct would be unreasonable, are questions for the jury.

b.  Claim relating to fact of intrusion into genital areas

Mwimanzi next claims that Wilson violated the Fourth Amendment just by probing into
certain sensitive areas, including manipulating his testicles and probing his buttocks.  See Pl.'s
Combined Br. at 36–41.  In effect, Mwimanzi has tied a portion of this second § 1983 claim to
his first one, asking the Court to hold Wilson liable, too, for exceeding the search authority set
out in the warrant.  See id. at 36 (noting connection between claims).  In Mwimanzi's view,
because his presence in the Quebec Place apartment at most authorized the police to conduct a
Terry frisk, any probing of his genital area beyond a general "pat down" gives rise to separate

Fourth Amendment liability.  Id. at 37–38.  The Court grants Officer Wilson summary judgment on this portion of the claim because he is entitled to qualified immunity.

Because this portion of the claim is both legally and factually linked to his Monell claim against the District, the Court has little trouble concluding that Mwimanzi is right on the merits. The warrant for the Quebec Place apartment named neither Mr. Mwimanzi nor any other individual, and nothing found while executing the warrant gave rise to sufficient probable cause for any arrest or full search.  See supra Part III.A.2.a.  As a result, the police could not "squeez[e], slid[e], and otherwise manipulat[e] objects or areas on [his] person," as that kind of "intimate and intrusive search" falls "outside the bounds of a pat-down frisk."  United States v. Ashley, 37 F.3d 678, 680 (D.C. Cir. 1994).

But existing law in January 2019 did not put it "beyond debate" that such a full search based on a premises warrant alone would be unconstitutional.  See Wesby, 138 S. Ct. at 589. The Court's analysis above demonstrates this point.  As the Court noted, Ybarra was not directly controlling, given the distinction courts have since raised between public and private spaces. And none of the other in-jurisdiction cases discussed above confronted the exact legal question at issue here.  Cf. White, 512 A.2d at 285–87 (expressly declining to decide whether a search authorized under D.C. Code § 23-524(g) alone might be unconstitutional).

At oral argument, Mwimanzi cited several out-of-circuit cases that, he suggests, constitute a robust consensus of authority that initiating the search here was unlawful.  See Mot. Hr'g Rough Tr. at 14:2–6 (discussing Groody, 361 F.3d at 243; Ward, 682 F.2d at 881; United States v. Gregg, 833 F. Supp. 2d 535, 537, 539 (E.D. Va. 2011)).  While the Court has previously relied on similar non-binding precedent to reject Wilson's qualified immunity defense, it declines to do so here.  At least one of those out-of-circuit cases fails to even address Ybarra or

the scope of its reach.  See Gregg, 833 F. Supp. 2d at 538–41.  And closer to home, the D.C.

Circuit has observed that discerning the scope of authority to search pursuant to a premises

warrant has been a particularly thorny issue; as that court noted decades ago—and has not

clarified since—"[t]he concept that a premises search warrant does not embrace personal

searches has presented some difficulty in application."  Branch, 545 F.2d at 181.  So, while the

Court is satisfied with the result it reached above, it does not believe that the rule just discerned

was settled law in this circuit as of January 2019, such that no reasonable officer would believe

his conduct lawful.[9]  For these reasons, the Court will grant Wilson summary judgment as to the

portion of Mwimanzi's claim against him turning on the scope of the search.

### 2.  *Battery claim against Officer Wilson and the District*

The final count in the complaint is a common law battery claim against Wilson and the

District, as Wilson's employer, arising out of the same manner-of-search allegations relevant to

Mwimanzi's § 1983 claim against Wilson.  Under D.C. law, "[a] police officer is liable for

battery when she commits an 'intentional act that causes harmful or offensive bodily contact' and

when the officer's use of such force was 'in excess of [that] which the actor reasonably believes

to be necessary.'"  Hall, 867 F.3d at 159 (quoting District of Columbia v. Chinn, 839 A.2d 701,

705–06 (D.C. 2003)).  Battery cases generally turn on this second showing, which goes to the

officer's qualified privilege defense.  See Chinn, 839 A.2d at 706.  That privilege inquiry

involves both a subjective and an objective component: "[T]he officer must subjectively believe

that he or she used no more force than necessary, but the officer's judgment is [also] compared to

---

[9] The Court is not crediting a "just following orders" defense, as Mwimanzi suggests.
See Pl.'s Combined Br. at 39–40 (citing Hobson v. Wilson, 737 F.2d 1, 67 (D.C. Cir. 1984)).
The Court's conclusion rests not on the existence of the D.C. statute but on the fact that its
constitutionality was an open question at the time of the search.

that of a hypothetical reasonable police officer placed in the same situation." Hall, 867 F.3d at
159 (alterations in original).  The D.C. Court of Appeals has likened this inquiry to the standard
for a Fourth Amendment excessive force claim.  Etheredge v. District of Columbia, 635 A.2d
908, 916 (D.C. 1993) (citing Graham, 490 U.S. at 396–97).  The District, which may otherwise
be vicariously liable, is entitled to this privilege defense to the same extent as its employee police
officer.  See Jenkins v. District of Columbia, 223 A.3d 884, 900 (D.C. 2020).

Here, the defendants have moved for summary judgment on Mwimanzi's battery claim
solely on privilege grounds.  Defs.' MSJ at 11–12.  At summary judgment, the relevant question
is whether Wilson is entitled to a finding of privilege as a matter of law—in other words,
whether any reasonable jury must find that he satisfies both the subjective and objective
component of the inquiry.  See Hall, 867 F.3d at 159 (denying summary judgment after
"[d]iscovery corroborated [plaintiff's] allegations that [the officer] used force against her without
justification, creating a jury issue on the battery claim").  The D.C. Court of Appeals has not
determined which party bears the burden of proof as to privilege to commit a battery.  Jenkins,
223 A.3d at 902–03.  As explained below, the Court holds that Mwimanzi's battery claim
survives summary judgment to the same extent as his related Fourth Amendment claim, whoever
bears the burden of proof.

a.   Claim relating to use of force during search

The Court will first deny the defendants summary judgment on the portion of
Mwimanzi's battery claim arising out of allegations that Officer Wilson aggressively and
forcefully fondled him during the search.  The standard for this claim "is similar to the excessive
force standard applied in the Section 1983 context."  Kinberg v. District of Columbia, No. 94-cv-
2516, 1998 WL 10364, at *13 (D.D.C. Jan. 5, 1998), aff'd sub nom. Rogala v. District of

Columbia, 161 F.3d 44 (D.C. Cir. 1998) (citing Etheredge, 635 A.2d at 915 n.10).  And as the
Court has already explained, see supra Part III.B.1.a, Mwimanzi has presented sufficient
evidence for such an excessive force claim to survive summary judgment on these allegations.
See also Taylor v. Guida, No. 17-cv-123, 2019 WL 4750366, at *5 (D.D.C. Sept. 30, 2019)
(denying summary judgment on battery claim "for the same reasons that the Court concluded
that summary judgment was inappropriate on the plaintiff's excessive force claim under Section
1983").

   In addition, Wilson and the District are not entitled to a finding that Wilson's conduct
was privileged as a matter of law, no matter who bears the ultimate burden of proof.  As to the
subjective prong, the defendants have only argued that Wilson believed *the search* was
authorized by the warrant.  He has neither claimed nor presented any evidence that he believed it
was necessary to "squeeze[] and rub[]" Mwimanzi's testicles multiple times, or to "press[]
[Mwimanzi's] anus with his finger as if he was trying to penetrate."  Pl.'s SMF II, ¶¶ 22, 26.  He
thus has not satisfied the subjective component of the inquiry.

   And even if he had, the Court is not convinced that the objective side of the inquiry must
be resolved in Wilson's favor.  The defendants raise two specific arguments on this point, both of
which the Court has already rejected in other contexts.  First, the defendants argue that the body-
worn camera footage resolves any potential disputes of material fact, making it impossible for a
jury to find that the search here was excessive.  See Defs.' MSJ at 12.  The Court has already
explained that the camera footage here obscures the most salient facts about where and how
Wilson searched Mwimanzi's groin.  See supra Part III.B.1.a.  Second, the defendants argue that
no jury could find Wilson's acts unreasonable because Mwimanzi has not identified a police
practices expert to establish standards for a reasonable search.  See Defs.' MSJ at 12.  But there

is no per se rule requiring expert testimony for a police battery claim under D.C. law.  Whether a reasonable police officer would believe that such purportedly aggressive and invasive conduct was reasonably necessary to effectuate a search is just the sort of issue that can be resolved wholly within the realm of ordinary human knowledge and experience.  See Smith v. District of Columbia, 882 A.2d 778, 791–92 (D.C. 2005) (holding that, under the circumstances, plaintiff was not required to introduce expert testimony to support battery claim arising out of claim of police excessive force); Greene v. Shegan, 123 F. Supp. 3d 88, 92 (D.D.C. 2015) ("[Plaintiff's] lack of expert evidence regarding the use of force during an arrest did not entitle the defendants to summary judgment.").  Because Wilson was not as a matter of law entitled to use the type of force Mwimanzi describes, this portion of the battery claim must go to the jury.

### b.  Claim relating to fact of intrusion into genital areas

From Mwimanzi's complaint and briefing, it is not clear whether his battery claim, too, covers any conduct of Officer Wilson's that went beyond what is authorized in a pat-down frisk. See Proposed Am. Compl. ¶ 74 (alleging that Wilson committed a battery only "when he intentionally molested Mr. Mwimanzi's testicles and pressed between his buttocks hard enough to cause pain, all without justification").  To the extent Mwimanzi does press such a claim, the Court concludes that Wilson's conduct was privileged as a matter of law.

Wilson first satisfies the subjective prong of the privilege inquiry.  He has testified that he believed a full search of Mwimanzi was authorized by the search warrant and MPD General Order 702.03, and that a search of the groin was justified because, in his experience, those involved in drug dealing often hide contraband in that area.  Defs.' SMF ¶¶ 18, 20.  Mwimanzi hasn't offered any facts that would directly counter Wilson's self-reported belief.  See Pl.'s SMF I, ¶ 18; Defs.' Resps. to Pl.'s SMF I, ¶ 18.  While he disputes whether Wilson had other reasons

to *target* the groin, Pl.'s SMF I, ¶ 18, that disagreement speaks more to the invasive and aggressive nature of the search, not Wilson's authority to conduct one at all.

Wilson also satisfies the objective prong of the privilege inquiry on this portion of the battery claim, as a hypothetical reasonable police officer placed in the same situation at the time would have believed he could initiate a search of the groin.  To be sure, as the Court determined above, the warrant did not in fact authorize a full search of Mwimanzi, including of his groin. But as the Court has also already held, such a rule was not clearly established law at the time. See supra Part III.B.1.b.  Although the privilege and qualified immunity inquiries may differ in certain respects, the basic point is the same—whether a reasonable officer at the time would have believed he could search Mwimanzi.  See Jenkins, 223 A.3d at 900 (noting that privilege standard "resembles the section 1983 . . . and qualified immunity standards"); Kotsch v. District of Columbia, 924 A.2d 1040, 1047 n.7 (D.C. 2007) (suggesting that qualified immunity and qualified privilege have "closely related—but theoretically different—underpinnings").  Here, a reasonable officer would have believed, in January 2019, that he was authorized to conduct a full (but otherwise reasonable) search of Mwimanzi.  Accordingly, Wilson—and by extension the District—had a qualified privilege to make contact with Mwimanzi's genitals in the ordinary course of conducting a full search.

## IV.  Conclusion

For the foregoing reasons, the Court grants both plaintiff's motion for leave to amend and his contingent motion for partial summary judgment on his new claim.  D.C. Code § 23-524(g) and MPD General Order 702.03 § VII(F)(8)(f) are unconstitutional insofar as they authorize searches of individuals based solely on their presence in a residence covered by a premises search warrant to find items named in that warrant.  The Court will also grant in part and deny in

part the defendants' motion for summary judgment on the two manner-of-search claims.  To the

extent they relate to allegations that Officer Wilson's search was particularly forceful and

invasive, these claims must be resolved by a jury.  A separate Order shall accompany this

memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 8, 2022